# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
May 13, 2013 Session

## IN RE SHANNON P. ET AL.

### Appeal from the Juvenile Court for Knox County
### No. 116803    Timothy Irwin, Judge

---

### No. E2012-00445-COA-R3-PT-FILED-JULY 16, 2013

---

This is a termination of parental rights case focusing on the five minor children ("the Children") of Tineaka P. ("Mother") and Shannon P., Sr. ("Father"). The Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of both parents on June 14, 2011. The petition alleged several grounds for termination, including severe child abuse, abandonment based on willful failure to support the Children, persistent conditions, and substantial noncompliance with the permanency plan. Following a bench trial, which concluded in February 2012, the trial court granted the petition as to Mother after finding by clear and convincing evidence that Mother had committed severe child abuse, that she had abandoned the Children due to her willful failure to pay child support, that she had failed to substantially comply with the permanency plan, and that the conditions leading to removal persisted. Father was granted an additional ninety days to attempt to improve his situation, and a hearing date was set for May 10, 2012, regarding the termination of his parental rights. At the conclusion of the bench trial on May 10, the court also terminated Father's parental rights after finding by clear and convincing evidence that Father had failed to substantially comply with the permanency plan and that the conditions leading to removal persisted. The trial court also found that termination of both parents' parental rights was in the Children's best interest. Mother and Father have appealed. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Tineaka P.

Andrew J. Crawford, Knoxville, Tennessee, for the appellant, Shannon P., Sr.

Robert E. Cooper, Jr., Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. Factual and Procedural Background

Mother and Father are the parents of five minor children: Shannon, Jr., now age eight; Jayquan, age four; Cheyanne, age three; Shalyn, age two, and Dakota, age one. DCS became involved with the family when the fourth child, Shalyn, was born in 2010, with both child and Mother testing positive for cocaine. The oldest four siblings were placed in the temporary custody of DCS on August 6, 2010, after Father also tested positive for cocaine. Custody of Dakota was awarded to DCS on May 4, 2011. When Dakota was born in April 2011, both child and Mother tested positive for cocaine. Mother's medical records demonstrated that she also tested positive for cocaine during her pregnancy with Dakota.

An initial permanency plan regarding the four older Children was developed on August 23, 2010, and ratified by the trial court on September 30, 2010. The requirements of the plan included, *inter alia*, that both parents obtain alcohol and drug assessments and follow all treatment recommendations; that the parents demonstrate sobriety by passing random drug screens; that both parents maintain a stable source of legal income, as well as suitable housing free of environmental hazards or risks to the Children; that Mother obtain mental health treatment; and that both parents visit regularly and pay child support. The plan was updated on April 14, 2011, when both parents reported participation in drug treatment, despite failing drug screens administered on that date. Mother was pregnant with Dakota at that time and was warned regarding the risk of using cocaine while pregnant. The updated plan was ratified by the trial court on May 4, 2011.

The updated permanency plan required Father to continue his current intensive outpatient treatment program until completion, stating: "If at any time during treatment, he continues to test positive for illegal substances, he will need to complete a new substance abuse assessment to reassess his treatment needs." Father was also required through treatment to identify stressors that led him to engage in substance abuse, and to work with his therapist on developing a relapse prevention plan. Father was responsible for providing verification of his participation in an aftercare program such as Alcoholics Anonymous or Narcotics Anonymous.

Mother was similarly required in the updated plan to address her substance abuse issues by participating in treatment and aftercare, obtaining a sponsor, and developing a relapse prevention plan. Mother reported to DCS at that time that she was participating in an intensive outpatient program at Peninsula Lighthouse, and she was asked to sign a release so that DCS could obtain those records. The prior requirements regarding income, housing, child support, and visitation remained unchanged. The parents were additionally obligated to maintain better communication with DCS. Following Dakota's birth, a similar permanency plan was implemented with regard to him.

DCS filed a petition seeking to terminate the parental rights of Mother and Father on June 14, 2011. The petition alleged several grounds for termination, including severe child abuse, abandonment based on willful failure to support the Children, persistent conditions, and substantial noncompliance with the permanency plan. A bench trial was conducted regarding this petition over several non-consecutive days, spanning a time frame from October 2011 to May 2012. Mother's parental rights were terminated at the conclusion of the hearing on February 2, 2012, based on the grounds of severe child abuse, abandonment by willful failure to support, substantial noncompliance with the permanency plan, and persistent conditions. The trial court concomitantly granted Father an additional ninety days to "get his house in order" and demonstrate that he could be free of drugs and appropriately parent the Children without Mother's involvement.

Following the final hearing on May 10, 2012, Father's parental rights were terminated based on the grounds of persistent conditions and substantial noncompliance with the permanency plan. Both Father and Mother timely appealed the termination of their parental rights.

## II. Issues Presented

The parties present the following issues for our review, which we have restated slightly:

1.    Whether the trial court erred in allowing the order of the Juvenile Court Magistrate, dated November 2, 2010, which found that Mother had committed severe child abuse, to be entered into the trial record.

2.    Whether the trial court erred in finding that Mother had committed severe child abuse.

3.    Whether the trial court erred in finding that Mother had abandoned the Children by willfully failing to pay support for four months preceding

-3-

the filing of the termination petition.

4. Whether the trial court erred in finding that Mother had failed to substantially comply with her permanency plan.

5. Whether the trial court erred in finding that the conditions leading to removal of the Children still persisted as a ground for terminating Mother's parental rights.

6. Whether the trial court erred in finding by clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest.

7. Whether the trial court erred in terminating Father's parental rights because DCS failed to produce sufficient evidence to prove any statutory ground for termination.

8. Whether the trial court erred in terminating Father's parental rights by determining that DCS made reasonable efforts to reunify Father and the Children.

9. Whether the trial court erred in finding by clear and convincing evidence that termination of Father's parental rights was in the Children's best interest.

### III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *Id.*; Tenn. R. App. P. 13(d). Questions of law, however, are reviewed *de novo* with no presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92

S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has instructed:

> In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36–1–113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36–1–113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State Dep't of Children's Servs. v. Mims* (In re N.B.), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

### IV. Prior Order Finding Severe Child Abuse

Mother argues that the trial court should not have allowed DCS to file the November 2, 2010 order of the Knox County Juvenile Court Magistrate, finding that Mother had committed severe child abuse against the Children, as an exhibit at the termination of parental rights trial. Mother states that she filed an appeal from this order, which was still pending at the time of the termination hearing. Mother's contention is that because this order was being appealed, it did not constitute a final order and should not have been admitted at the termination hearing or relied upon for any res judicata effect.

DCS agrees that a non-final judgment cannot be the basis for res judicata until all appellate remedies have been exhausted. *See Creech v. Addington*, 281 S.W.3d 363, 376 (Tenn. 2009). DCS contends, however, that the trial court's finding of severe child abuse by

Mother in the present termination proceeding was not based on the prior order, but rather predicated on other evidence adduced at trial. DCS argues that admission of the previous order was therefore immaterial. We agree. As noted in the following section, our review of the record demonstrates that the trial court did not place any reliance on the prior judicial finding of severe child abuse in making its ruling.

Mother relies on the case of *In re Shyronne D.H.*, No. W2011-00328-COA-R3-PT, 2011 WL 2651097 at *6 (Tenn. Ct. App. July 7, 2011), in support of her position. In *Shyronne*, the trial court found, during the hearing regarding dependency and neglect, that mother had committed severe child abuse. *Id.* At the subsequent hearing regarding termination of the mother's parental rights, the trial court allowed the prior order finding severe child abuse to be entered into the record, ruling that the order was conclusive on that issue, thereby precluding the mother from introducing any proof in defense. *Id. Shyronne* is clearly distinguishable from the case at bar, however, as the trial court herein did not rely on the prior order for its res judicata effect and did not preclude Mother from defending against the severe child abuse allegation during the termination hearing. Mother's reliance on *Shyronne* is misplaced, and this issue is without merit.

### V. Severe Child Abuse

Mother argues that the trial court erred in finding that she committed severe child abuse. Tennessee Code Annotated § 36-1-113(g)(4) (Supp. 2012), as relevant to this action, provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> * * *
>
> > (4) The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian . . . .

Tennessee Code Annotated § 37-1-102(b)(23) (Supp. 2012) defines "severe child abuse," in relevant part, as:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death . . . .

> As this Court has previously explained:

> a parent's conduct is "knowing, and a parent acts or fails to act 'knowingly,' when . . . [she] has actual knowledge of the relevant facts and circumstances or when . . . [she] is either in deliberate ignorance of or in reckless disregard of the information that has been presented to . . . [her]."

*In re H.L.F.*, 297 S.W.3d 223, 236 (Tenn. Ct. App. 2009) (quoting *In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122 at *6 (Tenn. Ct. App. July 13, 2004)).

DCS contends that the trial court was presented considerable evidence from which it could find that Mother committed severe child abuse, such as the medical records and drug tests establishing that Mother used cocaine during her pregnancies, as well as her admission of such conduct. DCS submits that there is substantial case law supporting a finding of severe child abuse for a parent exposing a child to drugs in utero, whether or not the child actually sustains harm. We agree. *See In re Benjamin M.*, 310 S.W.3d 844, 848 (Tenn. Ct. App. 2009) ("the healthy development of the child in this case does not diminish the severity of the harm to which the child was exposed.") (quoting *In re M.J.J.*, M2004-02759-COA-R3-PT, 2005 WL 873305 (Tenn. Ct. App. April 14, 2005)); *Cornelius v. State, Dep't. of Children's Servs.*, 314 S.W.3d 902, 910 (Tenn. Ct. App. 2009). In each of these cases, this Court determined that the mother was guilty of severe child abuse pursuant to Tennessee Code Annotated § 37-1-102(b)(23) for using controlled substances during pregnancy.

Mother admitted that she was an addict, that she "craved" cocaine during her pregnancies, and that she used cocaine on occasion during each of her most recent four pregnancies. Mother argues that the court erred in finding that such drug use constituted severe child abuse inasmuch as there was no medical evidence that the amount and frequency of cocaine use by Mother would cause serious bodily injury to an unborn child. She also points out that the children have not suffered long-lasting effects. As noted above, *M.J.J.* stands for the prescript that prenatal abuse of controlled substances constitutes severe child abuse, whether or not the child actually suffers harm. 2005 WL 873305 at *8. Further, Mother's argument ignores the clear evidence contained in Dakota's medical records, made

an exhibit at the termination hearing, probative that he suffered a premature birth, remained in the Neonatal Intensive Care Unit for several days, and was treated for symptoms of withdrawal.

Tennessee Code Annotated § 37-1-102(b)(23) requires a showing of "knowing exposure of a child to . . . abuse or neglect that is *likely to cause* serious bodily injury or death." (Emphasis added.) Mother admitted during her testimony that she used cocaine during four of her five pregnancies. Mother acknowledged that she was warned prenatal drug use was dangerous during at least two of her pregnancies and that she knew such conduct was wrong. The court characterized Mother's testimony as the "most graphic testimony squarely on the facts that I've heard in six years on the bench." We determine that the trial court's finding that Mother committed severe child abuse, made under a clear and convincing standard, is supported by a preponderance of the evidence.

### VI. Abandonment by Willful Failure to Pay Support

The trial court also terminated Mother's parental rights on the statutory ground that she abandoned the Children. Mother was ordered to pay a nominal amount of child support beginning in October 2010. Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2012) provides, as relevant to this action:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
>   (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred . . . .

Tennessee Code Annotated § 36-1-102(1)(A)(i) (2010) defines abandonment, in relevant part, as:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child . . . .

Pursuant to the statute, the court must find that a parent's failure to support the child was

willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). As this Court has previously explained:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.

*In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). Failure to visit or support a child is willful when a person is "aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864.

> This Court further explained:

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* (citations omitted).

Mother argues that the trial court erred in finding that her failure to support the Children was willful. Her position is premised upon the assertion that she was financially unable to pay any support due to her lack of employment and income. Mother asserts that she and Father have been married for a number of years and that she has always been a "stay-at-home mom," reliant upon Father for financial support. Therefore, she contends, it is unreasonable for DCS to expect her to pay child support independent of Father. She suggests that since Father tendered child support payments, his payments should be credited as made on behalf of both parents. Mother argues that DCS did not establish that she willfully failed to pay child support.

The proof at trial did evince that Mother was the primary caregiver for the Children before they were placed in state custody on August 6, 2010. Custody of Dakota was awarded to DCS on May 4, 2011, shortly after his birth and upon his release from the hospital. Therefore, from August 6, 2010, to June 14, 2011, when the petition to terminate parental rights was filed, Mother was no longer a "stay-at-home mom," as the Children were not in her care and custody. Mother did not maintain employment, despite the requirement in her

permanency plan that she do so. She testified that she was offered employment at McDonald's, but, desiring not to work the morning shift, she refused the offer. Mother did not report seeking any other potential employment opportunities. The trial court found that Mother could have worked after custody of the Children was removed, but chose to remain unemployed. Mother presented no justifiable reason for failing to seek employment so that she could support her Children. She also provided no basis supporting an inability to work. *See Audrey S.*, 182 S.W.3d at 864. The evidence does not preponderate against the trial court's determination, by clear and convincing evidence, that Mother willfully failed to support the Children.

### VII. Substantial Noncompliance with Permanency Plan

#### A. Mother

The trial court also terminated Mother's parental rights on the statutory ground that she failed to substantially comply with the reasonable responsibilities set out in her permanency plan. Tennessee Code Annotated § 36-1-113(g)(2) (Supp. 2012) provides, as relevant to this action:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> . . .
>
> > (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4.

The permanency plan in this case, *inter alia*, required Mother to address her substance abuse issues by participating in treatment and aftercare, obtaining a sponsor, and developing a relapse prevention plan. Mother was also required to demonstrate that she was free of drugs by passing random drug screens. In addition to obtaining mental health treatment, Mother was required to maintain a stable source of legal income, as well as suitable housing free of environmental hazards or risks to the Children. Finally, Mother was responsible for visiting the Children regularly, paying child support, and maintaining regular contact with DCS representatives.

In its findings regarding Mother's efforts under the permanency plan, the trial court

stated in relevant portion:

> The Department's representative, Sarah Jones, indicated that the biggest issues to be resolved by the mother were her substance abuse and the need for appropriate housing. Mother has attempted treatment on more than one occasion for her substance abuse, but has failed to complete any program successfully, including after-care. She does not have appropriate housing. She, like father, has been aware since the first plan of the necessity for appropriate housing. She has no appropriate housing, no income, has not provided information to [DCS] that she is receiving mental health treatment, and has failed to pay child support.

The proof supports these findings. Mother continued to fail drug tests throughout the pendency of these proceedings while claiming to be participating in drug treatment or aftercare. Mother testified that she graduated from the Peninsula Lighthouse program approximately one month after Dakota was born. She tested positive for cocaine upon his birth and on numerous occasions thereafter. Mother was arrested for theft and shoplifting offenses three times while the Children were in state custody. She initially testified that she was using drugs when she committed the offenses, but she later indicated that she was not on drugs and instead "used" acts of stealing to fulfill the desire that drugs once satisfied. Mother claimed to be attending meetings at Celebrate Recovery but could provide no substantiating proof. Mother acknowledged that she did not have a sponsor and that she was reliant on Father to transport her to the meetings.

As addressed above, Mother was not gainfully employed and admitted she had never paid child support. Mother and Father were living in a two-bedroom apartment by the time of the final hearing. According to Mother, she consulted a mental health provider from March to May 2011 but no longer needed treatment. Mother provided no proof of this assertion. A review of the evidence in this case establishes that it does not preponderate against the trial court's determination, by clear and convincing evidence, that Mother was in substantial noncompliance with the permanency plan.

## B. Father

Father was also found to be in substantial noncompliance with the permanency plan. Father's plan requirements were largely similar to those of Mother. Upon conclusion of the hearing in February 2012 wherein Mother's parental rights were terminated, the trial judge noted that he was "convinced in a technical sense" that DCS had proven the ground of substantial noncompliance with the permanency plan regarding Father. The court allowed Father an additional ninety days, however, to "get his house in order" by having extended

-11-

unsupervised or loosely supervised visitation with the Children to demonstrate that he could appropriately parent them. This also provided Father an opportunity to obtain appropriate housing, prove that he was actually clean of drugs, and demonstrate that he could provide the court with a plan for the Children's care while he was working. The court ruled that Father would need to develop a multi-faceted plan to include preparing the Children for school or daycare in the mornings, picking them up on time, providing respite care, and being available for care if sickness or emergency should arise.

During two subsequent hearings, Father presented proof that he had completed a drug treatment program on May 4, 2011. Father, however, failed or refused drug screens on numerous occasions after completion of the treatment program, with the latest failure recorded on February 13, 2012. Father did not engage in extended visits with the Children as the trial court had instructed. Rather, he canceled meetings with the DCS case manager during which they were to discuss a visitation schedule. He did not visit after the February 2, 2012 hearing until March 12, 2012, allegedly because he was working out of town. Father eventually became irate and angry with DCS case manager Jones, and a different DCS representative was assigned. The new case manager, Shelby Quinley, related that she called Father on March 16, 2012, and provided him with her contact information. She testified that thereafter, she had no contact with Father until she called him on the morning of the final hearing held May 10, 2012. Father scheduled visits with the Children through Helen Ross-McNabb and completed only three or four visits from mid-March through May 10. He provided no information concerning his plan for daycare, his work schedule, or individuals he proposed would provide supervision for the Children.

Father testified that he had contacted five daycare centers that were routinely open from 6:00 a.m. to 6:00 p.m., discovering that the Boys and Girls Club would provide care for Shannon, Jr., after school until 5:30 p.m. Father related that he spoke to his employer prior to the final hearing, and his employer agreed to assign Father a defined work schedule from 7:00 a.m. to 5:00 p.m. daily. Father claimed he possessed a list of relatives who could care for the Children if they were ill or at times he was at work and unable to transport. Father admitted, however, that he never provided this information to the DCS case manager for verification. Father also admitted that the only daycare cost estimate he had obtained was $125 per week per child. At the time of the final hearing, Father continued to reside in the same two-bedroom apartment. He was not working, having suffered a knee injury. Father testified that he earned $14.36 per hour, which rate translated into gross pay of less than $600 for a forty-hour work week.

The trial court found the following with respect to Father's progress toward the permanency plan requirements:

The primary issues that [DCS] was interested in were, generally speaking, appropriate housing, clean and with enough space for all of the children and for the father to treat his drug addiction and maintain sobriety. He is also responsible for child support and maintaining contact with the Department as to his circumstances and making the Department aware when his circumstances change and when he completes steps on his plan. Father has paid child support and visited more than a token amount. He has not successfully addressed his substance abuse issues, having a positive screen for cocaine and THC in February, 2012. He has not resolved housing issues. He has not provided a plan as to how he can care for these five children with their special needs. His income is less than $600.00 per week and his childcare, based on one estimate will be $500.00 per week without considering the cost of after-school care which would be $50.00 per week for the oldest child.

These findings are supported by the evidence. Father had not adequately addressed his drug problem, as demonstrated by his failed or refused drug screens following treatment. The permanency plan specifically stated that if Father continued to test positive for illegal substances during or after treatment, he would need to complete a new substance abuse assessment to reassess his treatment needs. Father did not do so, despite presenting positive drug screens. Father also did not attend aftercare, testifying that he did not believe he had an active drug addiction. There was no proof that Father had obtained a sponsor or developed a relapse prevention plan.

Father testified during the hearing in February 2012 that he and Mother had relocated into a two-bedroom apartment and were on the waiting list for a three-bedroom apartment. He was still living in the same two-bedroom apartment by the time of the final hearing in May 2012. Father did visit the Children, but not as extensively or consistently as the trial court intended, blaming his deficiency on work. Father did not maintain contact with DCS and did not provide his caseworker with any information regarding potential daycare centers or caregivers. The evidence does not preponderate against the trial court's determination, by clear and convincing evidence, that Father was in substantial noncompliance with the permanency plan.

## VIII. Persistence of Conditions

### A. Mother

Tennessee Code Annotated § 36-1-113(g)(3) provides the following as an alternate ground for termination of parental rights:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

By its order terminating Mother's parental rights, the trial court, *inter alia*, found that the requirements of this statutory section had been satisfied:

The housing and care of the children in the house was deplorable at the removal of the children into the custody of the Department of Children's Services. The mother was positive for cocaine, and the father tested positive for cocaine shortly thereafter, all of which caused the children to come into the custody of the Department. Mother has continued to abuse cocaine and recently attempted to subvert the Department's drug screen. She has no appropriate housing, no income, and has failed to support her children financially, all of which conditions existed at the time of the children's removal into DCS custody. Additionally, mother has never provided information to the Department of Children's Services that she is receiving mental health treatment.

Each finding reviewed in the previous section addressing Mother's substantial noncompliance with the permanency plan is equally determinative with regard to the statutory ground of persistence of conditions. As the trial court noted, the Children were removed because of Mother's cocaine abuse and the poor conditions found in the home. Mother did not adequately address her drug addiction and continued to fail drug screens through the date of the termination hearings. Mother did not seek employment, did not secure appropriate housing, did not pay child support, and continued to incur criminal charges. At the time her parental rights were terminated, the Children had been in custody

of the state for eighteen months, sufficient time for Mother to address these issues.

Mother continued to abuse drugs and did not regularly attend aftercare or obtain a sponsor. She discontinued her mental health treatment. Mother's attitude toward improving her situation appears apathetic at best. Her testimony demonstrated no understanding regarding how her poor choices impacted the Children. Consequently, there is little likelihood that these conditions will be remedied at an early date so that the Children can be safely returned to Mother in the near future. Further, there was ample testimony demonstrating that continuation of the parent-child relationship would diminish the chances of the Children making an early integration into a safe, stable, and permanent home, as the Children were already demonstrating symptoms of parental attachment problems. The counselor for Harmony Adoptions testified that the longer a child is delayed permanency, the more difficult for the child to make secure attachments. A review of the evidence in this case demonstrates that it does not preponderate against the trial court's determination, by clear and convincing evidence, that Mother's parental rights should be terminated upon the ground of persistent conditions.

## B. Father

The trial court also found at the conclusion of the hearing in February 2012, wherein Mother's parental rights were terminated, that DCS had proven the ground of persistent conditions regarding Father "in a technical sense." The court nevertheless granted Father an additional ninety days as an opportunity to improve his situation by obtaining appropriate housing, proving that he was free of drugs, and demonstrating that he could provide the court with a plan for the Children's care while employed. The court specifically admonished Father that Mother was not to be present around the Children, stating, "[Y]ou've got to show me that you can do it and want to do it without her. Because if you think it's going to be a team effort from now on, it's a pipe dream, because it's over for her."

As previously considered, Father did not demonstrate that he had sufficiently addressed his drug addiction, did not obtain appropriate housing, and did not furnish the court with a plan for providing care for the Children. Further, the evidence established that DCS employees made several visits to Father's home during February and March 2012, each time discovering the presence of Mother. At the final hearing in May 2012, Father testified that Mother was no longer living with him but that he would continue his relationship with her if she were successful with her appeal of the court's ruling terminating her parental rights. Father was asked, "Is it your intention to maintain a relationship with [Mother] even if she doesn't win her appeal?" Father responded, "[Mother] is not to stay away from me, she is to stay away from my children; is that not right, Mr. Maylott?" Later in his testimony, however, Father indicated that he would discontinue his relationship with Mother for the

welfare of the Children.[1]

By its order terminating Father's parental rights, the trial court, *inter alia*, found that the requirements of Tennessee Code Annotated § 36-1-113(g)(3) had been satisfied:

> The father, despite a significant number of different services over the time these children have been in custody, is essentially no closer to providing an appropriate home for the children by providing appropriate housing, demonstrating that he can be a single parent with a plan to provide for appropriate income and supervision. Father today asserts that when the time comes, he will ensure that [Mother] has no contact with the children. But he is not willing yet to sever his relationship with her. [Mother] has been in the house every time that the Department or its representatives visited in the past several months.
>
> Despite knowing that he was being given an additional chance by this Court to show that he could parent these children, [Father] failed to take the steps to take his name off the list at work that would take him out of the state to work. [Father], despite this Court providing clear guidance that he had the opportunity from February 2, 2012, to today's date to show that he could plan and perform as a single parent and provide for all of these children's needs failed to make meetings with DCS to plan some intensive visitation time with the children because he was working late or out of state. Today, after his children have been in care since August 6, 2010 for the four oldest children, and May 4, 2011, for Dakota, for the first time the father asserts that he has taken steps to adjust his work schedule to provide for a regular start and stop time and to provide for no out-of-state work. Although that is an appropriate step to take, it is too little, too late.
>
> Father was urged to present a plan for how to care for the children while he is at work. His most recent plan is a list of relatives, almost all of whom work, and who are thus unable to assist with daytime care for the children. Father has contacted several daycare centers that can accommodate his children, but obtained cost estimates for only one. Using that cost, father's daycare [cost] will almost consume his earnings. Again, only today, his last day for hearing on the termination of his rights, does this list of relatives surface, and only

---

[1] Mother testified at the February 2012 hearing that if her parental rights were terminated but Father's were not, she would not stay away from the Children, stating God gave them to her and "He's the only one that can keep me from my children."

when the Department took steps to call [Father]. He did nothing proactively to contact the Department to let them know so that his information could be verified.

Father today presents a certificate that he has completed intensive outpatient treatment, effective May, 2011. He has a positive drug screen in February, 2011, while attending that program.

Father has relied, to his detriment, on his wife and her chances on appeal from the termination of her parental rights. He has not faced the reality that she will likely not be a resource for the children and he has not stepped up and provided a plan to show the Court that he can appropriately and safely care for his children.

Interestingly, Mother and Father both tested positive for cocaine on 2-10-11 and 4-14-11. (Trial Exhibit #5, p. 25 and p. 27). This Court does not believe that the father can refrain from use of cocaine while the mother continues to abuse cocaine and continues to live with the father. This Court believes that the father knew the mother abused cocaine and that he did nothing to protect the children from her, as he allowed her to be the primary caretaker for the children.

This Court has given the father the extraordinary relief of an additional 90 days after the initial close of proof by the Department on February 2, 2012, to comply with the responsibilities on the permanency plan and to remedy the conditions that brought the children into custody, thereby proving to the Court that he had the ability to provide for the children without the assistance of the mother. He has failed to do so. He chose not to make himself available for the meetings set up to schedule his frequent, loosely supervised visitation with all five children. He has no place for the children with adequate space to live. He has no credible, specific plan to provide for the children's care while he is at work or to provide for the children's many visits to providers.

The evidence supports these findings. As the trial court had considered, the Children were removed because of the parents' cocaine abuse and the conditions found in the home. Father did not adequately address his drug problem. He continued to fail drug screens following treatment and through February 2012. Father did not have appropriate housing, continued to incur criminal charges, and refused to stay away from Mother, who was actively abusing drugs. At the time his parental rights were terminated, the Children had been in state custody for twenty-one months, a sufficient period for Father to address these issues. Father

was provided additional time by the trial court to show that he could appropriately parent the Children without Mother, but he failed in such task. Therefore, there is little likelihood that these conditions will be remedied at an early date so that the Children can be safely returned to Father in the near future. As stated above, there was also evidence that continuation of the parent-child relationship would diminish the chances of the Children making an early integration into a safe, stable, and permanent home. The evidence does not preponderate against the trial court's determination, by clear and convincing evidence, that Father's parental rights should be terminated upon the ground of persistent conditions.

## IX. Reasonable Efforts by DCS

Father further contends that DCS did not provide him with reasonable assistance in obtaining appropriate housing. As this Court has previously stated:

> [I]n the absence of aggravating circumstances, [DCS] is statutorily required to make reasonable efforts to reunite a family after removing children from their parents' custody. Tenn. Code Ann. § 37-1-166(a)(2), (g)(2) (2005); *In re M.E.*, No. M2003-00859-COA-R3-PT, 2004 WL 1838179, at *9 (Tenn. Ct. App. Aug.16, 2004), perm. app. denied (Tenn. Nov. 8, 2004); *In re C.M.M.*, 2004 WL 438326, at * 7. Because of this obligation, the Department must not only establish each of the elements in Tenn. Code Ann. § 36-1-113(g)(3)(A), it must also establish by clear and convincing evidence that it made reasonable efforts to reunite the family and that these efforts were to no avail. *In re C.M.M.*, 2004 WL 438326, at *7 n. 27, *8.

> While the Department's reunification efforts need not be "herculean," the Department must do more than simply provide the parents with a list of services and send them on their way. *In re C.M.M.*, 2004 WL 438326, at *7. The Department's employees must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan.

> For the purpose of proceedings such as this one, the Department's reunification efforts are "reasonable" if the Department has exercised "reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1) (2005). The reasonableness of the Department's efforts depends upon the circumstances of the particular case. The factors that courts use to determine the reasonableness of the Department's efforts include: (1) the reasons for separating the parent from his or her children, (2) the parent's physical and

-18-

mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

The Department does not have the sole obligation to remedy the conditions that required the removal of children from their parents' custody. When reunification of the family is a goal, the parents share responsibility for addressing these conditions as well. Thus, parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody.

*In re Giorgianna H.*, 205 S.W.3d 508, 518-19 (Tenn. Ct. App. 2006) (other internal citations omitted).

Father does not argue that DCS completely failed in its efforts in this case; rather, he asserts only that DCS did not provide him with sufficient assistance to obtain housing. Father concedes that the DCS caseworker testified that she wrote letters to assist the parents in obtaining better housing, but Father insists that DCS "routinely assists parents with initial rent payments so that the burden of paying a security deposit and other costs of moving is minimized." The lack of such assistance in this case is not determinative of whether DCS made reasonable efforts to reunite the family.

As stated above, parents also bear responsibility in making reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that necessitated removal of children from parental custody. In previous sections of this opinion, we have addressed the fact that Father failed in such responsibility. During the February hearing, Father related that he had been evicted from his prior residence, had recently rented a two-bedroom apartment, and was waiting for a three-bedroom apartment to become available. He testified that his DCS caseworker encouraged him to obtain housing prior to the hearing so that he would not be considered homeless. According to Father, this was the reason he accepted a two-bedroom apartment on a temporary basis. Father explained he was also exploring other options for better housing. By the time of the final hearing, Father was still residing in the two-bedroom apartment. No proof existed that Father requested any assistance from DCS in obtaining alternative housing. Further, Father was working and clearly maintained the physical and mental ability to seek help if needed and to investigate the resources available to him.

Ms. Jones, the caseworker, also testified at the February hearing, stating, "I've talked to [Father] about everything in the last month or two about his son Dakota because he had RSV, to living arrangements, to [Mother] being arrested the other day, to progress on housing." Ms. Jones did not detail her discussions with Father regarding housing but clearly expressed concern that he be able to show in court that he was no longer homeless. Despite being granted additional time to improve his circumstances (including his housing), Father failed to maintain contact with DCS employees. He missed at least two meetings scheduled with his caseworker and could not be reached for a few weeks while working out of town. Upon his return, he became belligerent and irate with Ms. Jones, causing the trial court to order that a different caseworker be assigned. The new caseworker, Ms. Quinley, testified that she immediately communicated with Father and provided him her contact information. He, however, completely failed to contact her thereafter.

Viewing the situation in its entirety, the trial court found that DCS had made "extraordinary" efforts to assist Father with regaining custody. We agree. In significant measure, Father did not take advantage of DCS's efforts. As this Court has previously stated:

> Reunification is a "two-way street," and the law does not require DCS to
> carry the entire burden of this goal. DCS cannot reasonably be expected to
> do everything for a parent.

*In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576 at *16 (Tenn. Ct. App. Oct. 13, 2008). By granting the ninety-day extension, the trial court allowed Father additional time to make reasonable and appropriate efforts to rehabilitate himself and to remedy the conditions leading to removal of the Children from his custody. Again, Father did not seize this opportunity to regain custody of his Children. As this Court stated in *Giorgianna*, DCS's efforts must be reasonable, not "herculean." We conclude that the efforts expended by DCS in this case were clearly reasonable. This issue is without merit.

## X. Best Interest of the Children

When a parent has been found to be unfit by establishment of a ground for termination, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Tennessee Code Annotated § 36-1-113(i) (Supp. 2012) provides a list of factors the trial court is to consider when determining if termination of parental rights is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.*, 182 S.W.3d

at 878.  Further, the best interest of a child must be determined from the child's perspective and not the parent's.  *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable

manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

## A. Mother

In this case, the trial court appropriately made factual findings regarding the above-listed statutory factors:

1.  The mother has not made any significant adjustment in her circumstances since the children came into the custody of [DCS] so as to make the children safe in her home. Mother has not addressed her own issues so that she can attend to the needs of the children. Drug addiction, housing and mental health remain unresolved issues for the mother.

2.  Mother has not effected any significant adjustment, much less a lasting adjustment after a multitude of appropriate and timely services put in place by [DCS] to address the mother's substance abuse issues and obtaining a means of supporting herself and the children, as well as a place to live. Given the time these children have been in custody and the time devoted to attempting to resolve the various family issues, it does not reasonably appear that such an adjustment is possible.

3.  Mother has continued to visit the children with regularity and respond to their needs during visits, and appears to love her children.

4.  Allowing the mother to have any of these children in her home would

not be safe for these children, and thus not in their best interest, as the mother continues to have a serious substance abuse problem that has not been adequately addressed. She likewise does not have a place large enough to house the children appropriately, given the problems the children have and the ages and gender of the children.

5. Jayquan, Shalyn, Cheyanne and Dakota have suffered from the consequences of the mother's consistent use of cocaine during her pregnancies.

6. The children have not been in the custody of the mother since August 6, 2010 (May 4, 2011 for Dakota [P.]). The children are in placements that would be willing to adopt the children, but [DCS] is committed to obtaining a placement that could accommodate all of the children, if possible, before considering separate adoptive homes.

7. Mother has not paid support for these children while in the custody of [DCS]. She was assessed an amount which included an arrearage and a child support amount for each child, but has never paid any amounts.

8. Ending the parent-child relationship will benefit the children as they will now be able to move on with their lives knowing that their mother will not be in their lives and they can unreservedly attach to appropriate caretakers . . . .

9. [DCS] has made more than reasonable efforts toward achieving permanency for these children. [DCS] cannot force the mother to comply with the permanency plan and get appropriate treatment, housing, and provide support for the children.

The court therefore concluded that it was in the Children's best interest to terminate Mother's parental rights. Upon our careful review of the entire record, we agree.

Reviewing the evidence in light of the statutory factors, it is clear that Mother did not make an adjustment to her circumstances or conduct such that it would be safe for the

Children to be in her home. After the time involved and effort expended by DCS in this case, an adjustment of circumstance does not reasonably appear possible. Mother did visit with the Children and had a relationship with them. Nonetheless, a present change in caretakers would likely have a detrimental effect given the Children's needs and Mother's inability or unwillingness to address her drug problem. Mother displayed neglect of and abuse toward the Children because of her drug use, and her home was not safe or appropriate as she continued in substance abuse. Mother's mental and emotional status would prevent her from providing a safe home or stability for the Children, as she seemed to lack the ability to appreciate the significance of her problem. Finally, Mother had paid no child support. The evidence does not preponderate against the trial court's determination, by clear and convincing evidence, that terminating Mother's parental rights was in the best interest of the Children.

B. Father

Similarly, with regard to Father, the trial court found that termination of his parental rights was in the Children's best interest. The trial court made appropriate findings regarding the factors listed in Tennessee Code Annotated § 36-1-113(i) as applicable to Father:

1.      He has not made any significant adjustment in his circumstances since the children came into custody of [DCS] so as to make the children safe in his home. The Court is not convinced of his continued sobriety and his housing and ability to care for the children as a single parent has not been established.

2.      Father has not effected any significant adjustment, much less a lasting adjustment after a multitude of appropriate and timely services put in place by [DCS] to address the father's substance abuse issues, obtaining appropriate housing and a means to care for the children. Given the length [of time] these children have been in custody, and the time devoted to attempting to resolve the various family issues, it does not reasonably appear that such an adjustment is possible.

3.      Father, with the exception of the time that he was out of town, has continued to visit the children with regularity and respond to their needs during visits, and appears to love his children. The Court is concerned that the father did nothing to adjust his work schedule until the last

possible moment, so that he could exercise more frequent visitation with the children. He had the ability to do so, but never chose to try until just before the final date of trial in this matter.

4. Father does appear to have a meaningful relationship with these children.

5. The effect of a change of caretakers and physical environment is likely to have a detrimental effect on these children as father's home is inappropriate in size, he has no workable plan for the care of the children during the day and he has never had to be the sole caretaker for his children in the past.

6. [Father] has neglected these children by allowing them to live in an inappropriately dirty home, by allowing the cocaine-abusing mother to care for the children, and by using cocaine himself while the children were in his care.

7. Allowing the father to have any of these children in his home would not be safe for the children, and thus not in their best interest, as the father continues to have a relationship with the cocaine-abusing mother and will continue to do so until the Court of Appeals speaks to the issue of the appropriateness of the termination of the mother's parental rights. Additionally, the father does not have adequate space to house the children, adequate income to fund his child-care plan, nor has he explained how he will work full-time and get the children to therapy appointments.

8. The children have not been in the custody of the father since August 6, 2010 (May 4, 2011 for Dakota [P.]). They are now in placements that are willing to adopt them, though they are not currently placed together. DCS has enlisted the help of Harmony Adoptions to aid in locating a home that can take all five children, and failing that, some split placement and adoption option.

9. Ending the parent-child relationship will benefit the children as they

will now be able to move on with their lives knowing that their parents will not be in their lives and they can unreservedly attach to appropriate adoptive foster home(s).

10.     [DCS] has made more than reasonable efforts toward achieving permanency for these children. In fact [DCS] has made extraordinary efforts. [DCS] cannot force the father to comply with his responsibilities on the permanency plan.

The court therefore concluded that it was in the Children's best interest to terminate Father's parental rights. Following a thorough review of the record, we agree.

Reviewing the evidence in light of the statutory factors, it is clear that Father did not make an adjustment to his circumstances or conduct such that it would be safe for the Children to be with him, even after being given additional time to do so. As the trial court noted, DCS made extensive efforts in this case; therefore, an adjustment at this point does not reasonably appear possible. Father did visit with the Children and had a relationship with them. Changing caretakers would likely have a detrimental effect given the Children's needs, as Father presented no viable plan to care for them by himself. Father did pay child support. Father showed neglect of and abuse toward the Children by reason of his drug use, and his home was not safe or appropriate. Father's mental and emotional status would prevent him from providing a safe home environment or stability for the Children, as he clearly did not intend to keep them away from Mother, who was still abusing drugs. The evidence does not preponderate against the trial court's determination, by clear and convincing evidence, that terminating Father's parental rights was in the best interest of the Children.

## XI. Conclusion

The judgment of the trial court terminating the parental rights of Mother and Father is affirmed. Costs on appeal are taxed to appellants, Tineaka P. and Shannon P., Sr. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE